1  BLOOD HURST & O'REARDON, LLP
   TIMOTHY G. BLOOD (149343)
2  THOMAS J. O'REARDON II (247952)
   JENNIFER L. MACPHERSON (202021)
3  701 B Street, Suite 1700
   San Diego, CA  92101
4  Tel: 619/338-1100
   619/338-1101 (fax)
5  tblood@bholaw.com
   toreardon@bholaw.com
6  jmacpherson@bholaw.com

7  [Additional counsel appear on signature page]

8  Attorneys for Plaintiff

9              UNITED STATES DISTRICT COURT

10       FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11  ANDREW DREMAK, on Behalf of          Case No.   '17 CV1829 JM   BGS
    Himself and All Others Similarly
12  Situated,                            **CLASS ACTION**

13               Plaintiff,              **CLASS ACTION COMPLAINT**

14       v.

15  EQUIFAX, INC.,

16               Defendant.              **DEMAND FOR JURY TRIAL**

17

18

19

20

21

22

23

24

25

26

27

28

Case No.

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

1       Plaintiff Andrew Dremak ("Plaintiff"), individually and on behalf of the

2 general public and all others similarly situated (the "Class members"), by and

3 through his attorney, upon personal knowledge as to facts pertaining to him and

4 on information and belief as to all other matters, brings this action against

5 Defendant Equifax, Inc. ("Equifax"), and respectfully states the following:

6                    **NATURE OF THE CASE**

7       1.     Equifax waited until September 7, 2017, to announce it experienced

8 a massive data breach involving some of the most sensitive and private

9 information from approximately 143 million U.S. consumers (the "Data

10 Breach"). According to Equifax "[c]riminals exploited a U.S. website application

11 vulnerability to gain access to certain files. Based on the company's

12 investigation, the unauthorized access occurred from mid-May through July

13 2017." Equifax revealed the accessed information includes names, Social

14 Security numbers, birth dates, addresses, driver's license numbers, credit card

15 and certain dispute documents with personal identifying information.

16       2.     Equifax is a global giant in the business of maintaining and using

17 private, sensitive consumer information. While primarily known as a consumer

18 reporting agency, Equifax has expanded its information collection and

19 dissemination services to include subscription-based credit monitoring and

20 identity theft protection services for consumers and payroll and human resources

21 services. According to Equifax it "organizes, assimilates and analyzes data on

22 more than 820 million consumers and more than 91 million businesses

23 worldwide[.]"

24       3.     As part of its business, Equifax collects and organizes personal

25 private information about consumers, including Plaintiff and other Class

26 members. Equifax obtains consumers' private information from the services it

27 provides, as well as from credit card companies, banks, credit unions, retailers,

28 auto and mortgage lenders, and other sources that provide personal private

information to Equifax and other credit reporting agencies. Equifax disseminates this information, which includes consumer credit scores, credit histories, and risk analysis to lenders, retailers, automotive dealers, and mortgage companies. This information determines an individual's creditworthiness, which can affect their ability to gain loans, housing and jobs.

4.      Equifax also is in the business of selling credit and identity theft protection services to consumers; a highly lucrative business in which it makes many millions of dollars.

5.      Plaintiff and the other Class members reasonably expect and believe that Equifax will take appropriate measures to protect their personally identifiable information ("PII"). Equifax informs customers that it will protect their PII. According to Equifax, it has "built our reputation on our commitment to deliver reliable information to our customers (both businesses and consumers) and to protect the privacy and confidentiality of personal information about consumers. We also protect the sensitive information we have about businesses. Safeguarding the privacy and security of information, both online and offline, is a top priority for Equifax."

6.      Equifax assures consumers using its personal credit report service that it is "committed to protecting the security of your information through procedures and technology." Consumers of Equifax's personal products are told that Equifax is "committed to protecting the security of your personal information and use technical, administrative and physical security measures that comply with applicable federal and state laws."

7.      Equifax's cybersecurity measures were so deficient that it took almost three months for it to discover that criminal hackers had gained access to Plaintiff's and Class members' PII.

8.      Equifax owed a legal duty to Plaintiff and the other Class members to maintain reasonable and adequate security measures to secure, protect, and

BLOOD HURST & O'REARDON, LLP

2

CLASS ACTION COMPLAINT

safeguard the personal information stored on its network. Equifax breached that duty by failing to design and implement appropriate firewalls and computer systems, failing to properly and adequately encrypt data, and unnecessarily storing and retaining Plaintiff's and the other Class members' personal information on its inadequately protected network.

9.    Equifax was aware of its inadequate cybersecurity before the Data Breach, yet failed to appropriately safeguard the PII. Before the Data Breach, Equifax's network had been hacked by criminals on numerous occasions. Nonetheless, Equifax failed to take reasonable measures to safeguard the PII and never warned Plaintiff and the other Class members that the information they provided to Equifax was unreasonably susceptible to hackers. To the contrary, Equifax promised it was adequately safeguarding consumers' PII.

10.    As the result of Equifax's inadequate cybersecurity, the Data Breach occurred and Plaintiff's and the other Class members' PII was compromised and stolen, placing them at an increased risk of fraud and identity theft, and causing direct financial expenses associated with credit monitoring, replacement of compromised credit, debit and bank card numbers, and other measures needed to protect against fraud arising from the Data Breach.

11.    This action seeks to remedy these failings. Plaintiff brings this action on behalf of himself and persons whose personal or financial information was disclosed as a result of the data breach first disclosed by Equifax on or about September 7, 2017.

12.    Plaintiff seeks, for himself and the Class, injunctive relief, actual and other economic damages, consequential damages, nominal damages or statutory damages, punitive damages, and attorneys' fees, litigation expenses and costs of suit.

Case No.

BLOOD HURST & O'REARDON, LLP

**CLASS ACTION COMPLAINT**

**VENUE AND JURISDICTION**

13.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d), because this is a class action involving more than 100 Class members, the amount in controversy exceeds $5 million exclusive of interest and costs, and many members of the Class are citizens of states different from Defendant.

14.     This Court has personal jurisdiction over Equifax because Equifax is authorized to conduct business in California, and does in fact conduct business in California. Equifax therefore has sufficient minimum contacts with the state to render exercise of jurisdiction by this Court in compliance with traditional notions of fair play and substantial justice.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Equifax regularly conducts business in this district, unlawful acts or omissions are alleged to have occurred in this district, and Equifax is subject to personal jurisdiction in this district.

**PARTIES**

16.     Plaintiff Andrew Dremak is an individual and a resident of San Diego, California. On information and believe, Mr. Dremak has provided Equifax with access to his confidential and highly sensitive personal and private information in connection with loan and credit applications. On September 8, 2017, Mr. Dremak visited Equifax's website, https://www.equifaxsecurity2017.com/, to check if his sensitive PII was stolen as a result of the Equifax Data Breach. After entering his last name and the last six digits of his social security number, Mr. Dremak received a prompt that stated his information "may have been impacted" by the Data Breach:

///

///

///

BLOOD HURST & O'REARDON, LLP

4

Case No.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9

BLOOD HURST & O'REARDON, LLP

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Thank You**

Based on the information provided, we believe that your personal information may have been impacted by this incident.

Click the button below to continue your enrollment in TrustedID Premier.

Enroll

For more information visit the FAQ page.

Concerned, and believing his PII was stolen and compromised, Mr. Dremak followed Equifax's instructions to enroll in TrustedID Premier monitoring services. However, after clicking "Enroll", Mr. Dremak was not able to enroll. Instead, he was simply provided a future "enrollment date" to sign up for Equifax's TrustedID Premier monitoring services, and informed to check back on the future date because he would not receive additional reminders:

**Thank You**

Your enrollment date for TrustedID Premier is:

**09/13/2017**

Please be sure to mark your calendar as you will not receive additional reminders. On or after your enrollment date, please return to faq.trustedidpremier.com and click the link to continue through the enrollment process.

For more information visit the FAQ page.

17.    Plaintiff Dremak's sensitive PII has been compromised and stolen as a result of the Data Breach and Equifax's unlawful conduct alleged herein. As a direct and proximate result of Equifax's wrongful actions, inaction and/or

Case No.
**CLASS ACTION COMPLAINT**

00126062

omissions, the resulting Data Breach, and the resulting identity theft and identity fraud[1] inflicted on Plaintiff by one or more unauthorized third parties, Plaintiff also has suffered (and will continue to suffer) economic damages and other injury and harm in the form of the deprivation of the value of his PII, for which there is a well-established national and international market. PII is a valuable property right. Faced with the choice of having his PII disclosed, compromised, transferred, sold, opened, read, mined and otherwise used without his authorization versus selling his PII on the black market and receiving the compensation himself, Plaintiff would choose the latter. Plaintiff – not data thieves – should have the exclusive right to monetize his PII. Equifax's wrongful actions, inaction and omissions, and the resulting Data Breach, deprived him of this right.

18.    As a further direct and proximate result of Equifax's wrongful actions, inaction and/or omissions, the resulting Data Breach, and the resulting identity theft and identity fraud inflicted by one or more unauthorized third parties, Plaintiff has suffered (and will continue to suffer) other economic damages and injury and harm, including: (i) an imminent, immediate and the continuing increased risk of identity theft and identity fraud; (ii) invasion of privacy; (iii) breach of the confidentiality of his PII; (iv) deprivation of the value of his PII, for which there is a well-established national and international market; and/or (v) the financial and/or temporal cost of monitoring his credit, monitoring his financial accounts, and mitigating his damages – for which he is entitled to compensation.

---

[1]    According to the United States Government Accounting Office (GAO), the terms "identity theft" or "identity fraud" are broad terms encompassing various types of criminal activities. Identity theft occurs when PII is used to commit fraud or other crimes. These crimes include, *inter alia*, credit card fraud, phone or utilities fraud, bank fraud and government fraud (theft of government services, including medical services).

CLASS ACTION COMPLAINT

Case No.

BLOOD HURST & O'REARDON, LLP

00126062

1
2
3

19.     Defendant Equifax, Inc. is incorporated in Georgia, with its headquarters and principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309. Equifax is a citizen of Georgia.

4
5
6
7
8
9
10
11
12

20.     Equifax is one of the major credit reporting agencies in the United States. As a credit bureau service, Equifax is engaged in a number of credit-related services, as described by Equifax "[t]he company organizes, assimilates and analyzes data on more than 820 million consumers and more than 91 million businesses worldwide, and its database includes employee data contributed from more than 7,100 employers." As a credit reporting agency, Equifax maintains information related to the credit history of consumers and provides the information to credit grantors who are considering a borrower's application for credit or who have extended credit to the borrower.

13

## **FACTUAL ALLEGATIONS**

14

### *Personal Identification Information Is a Valuable Property Right*

15
16

21.     At a Federal Trade Commission ("FTC") public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's PII:

17
18

The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.

19
20

Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[2]

21
22
23

22.     Though Commissioner Swindle's remarks are more than a decade old, their pertinence has increased over time, as PII functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the

24
25

---

26
27
28

[2]     Federal Trade Commission, *The Information Marketplace: Merging and Exchanging Consumer Data*, *Conference and Workshop*, *Washington D.C.*, 28 (March 13, 2011), *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

BLOOD HURST & O'REARDON, LLP

1   United States.[3]

2      23.   The FTC has also recognized that PII is a new – and valuable – form

3   of currency. In a recent FTC roundtable presentation, another former

4   Commissioner, Pamela Jones Harbour, underscored this point by observing:

5      Most consumers cannot begin to comprehend the types and amount
       of information collected by businesses, or why their information
6      may be commercially valuable. Data is currency. The larger the data
       set, the greater potential for analysis – and profit.[4]
7

8      24.   Recognizing the high value that consumers place on their PII, many

9   companies now offer consumers an opportunity to sell this information to

10  advertisers and other third parties. The idea is to give consumers more power and

11  control over the type of information that they share – and who ultimately

12  receives that information. And by making the transaction transparent, consumers

13  will make a profit from the surrender of their PI.[5] This business has created a

14  new market for the sale and purchase of this valuable data.[6]

15     25.   Consumers place a high value not only on their PII, but also on the

16  *privacy* of that data. Researchers have already begun to shed light on how much

17  consumers value their data privacy – and the amount is considerable. Indeed,

18  studies confirm that "when privacy information is made more salient and

19  _____

20  [3]   *See* J. Angwin and W. Steel, *Web's Hot New Commodity: Privacy*, The
    Wall Street Journal, Feb. 28, 2001, *available at* http://online.wsj.com/article/
21  SB10001424052748703529004576160764037920274.html.

22  [4]   Federal Trade Commission, *Statement of FTC Commissioner Pamela
    Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), (Dec. 7,
23  2009), *available at* https://www.ftc.gov/public-statements/2009/12/remarks-ftc-
24  exploring-privacy-roundtable.

25  [5]   Steve Lohr, *You Want My Personal Data? Reward Me for It*, N.Y. Times,
    July            16,            2010,            *available*            *at*
26  http://www.nytimes.com/2010/07/18/business/18unboxed.html?_r=0.

27  [6]   *See* Julia Angwin and Emil Steel, *Web's Hot New Commodity: Privacy*,
    Wall Street Journal, Feb. 28, 2011, *available at* http://online.wsj.com/article/
28  SB10001424052748703529004576160764037920274.html.

BLOOD HURST & O'REARDON, LLP

CLASS ACTION COMPLAINT

accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[7]

26.    Notably, one study on website privacy determined that U.S. consumers valued the restriction of improper access to their PII – the very injury at issue here – between $11.33 and $16.58 per website.[8]

27.    The United States Government Accountability Office noted in a June, 2007 report on Data Breaches ("GAO Report") that identity thieves use identifying data such as SSNs to open financial accounts, receive government benefits and incur charges and credit in a person's name.[9] As the GAO Report states, this type of identity theft is the most harmful because it may take time for the victim to become aware of the theft and can adversely impact the victim's credit rating.

28.    In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."

29.    According to the FTC, identity theft victims must spend countless hours and large amounts of money repairing the impact to their good name and credit record.[10] Identity thieves use personal information such as SSNs for a variety of crimes, including credit card fraud, phone or utilities fraud, and

BLOOD HURST & O'REARDON, LLP

---

[7]    Janice Y. Tsai, *et al.*, *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study Information Systems Research* 22(2) 254, 254 (June 2011), *available at* http://www.guanotronic.com/~serge/papers/isr10.pdf.

[8]    II–Horn, Hann *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at table 3, *available at* http://citeseerx.ist.psu.edu/viewdoc/ download?doi=10.1.1.321.6125&rep=rep1&type=pdf (emphasis added).

[9]    *See* http:///www.gao.gov/new.items/d07737.pdf.

[10]    *See* FTC Identity Theft Website: www.ftc.gov/bcp/edu/microsites/idtheft/consumers /about-identity-theft.html.

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

bank/finance fraud.[11]

30.    With access to an individual's sensitive information, criminals are capable of conducting many nefarious actions. Besides emptying the victim's bank account, identity thieves also commit various types of government fraud, such as: (1) obtaining a driver's license or official identification card in the victim's name but with the thief's picture; (2) using the victim's name and SSN to obtain government benefits; and/or (3) filing a fraudulent tax return using the victim's information.

31.    In addition, identity thieves may obtain a job using the victim's SSN, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.[12]

32.    A person whose personal information has been compromised may not see any signs of identity theft for years. According to the GAO Report:

> "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."

33.    For example, in 2012, hackers gained access to LinkedIn's users' passwords. However, it was not until May 2016, four years after the breach,

---

[11]    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR §603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id*.

[12]    *See* FTC Identity Theft Website, *supra*.

Case No.

that hackers released the stolen email and password combinations.[13]

34.    "PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[14] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market" for several years. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

35.    Companies, in fact, also recognize PII and other sensitive information as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market.[15]

36.    As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs, PII and other sensitive information directly on various Internet websites making the information publicly available. In one study, researchers found hundreds of websites displaying stolen PII and other sensitive information. Strikingly, none of these websites were blocked by Google's safeguard filtering mechanism – the "Safe Browsing list." The study concluded:

///

///

///

---

[13]    *See* https://blog.linkedin.com/2016/05/18/protecting-our-members.

[14]    *See* John T. Soma, *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) (citations omitted).

[15]    Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html.

Case No.

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

00126062

BLOOD HURST & O'REARDON, LLP

It is clear from the current state of the credit card black-market that cyber criminals can operate much too easily on the Internet. They are not afraid to put out their email addresses, in some cases phone numbers and other credentials in their advertisements. It seems that the black market for cyber criminals is not underground at all. In fact, it's very "in your face."[16]

37.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

38.     It is within this context that Plaintiff and the 143 million Americans must now live with the knowledge that their personal information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Equifax Failed to Timely Disclose the Data Breach***

39.     On September 7, 2017, Equifax announced a massive Data Breach by criminals that gained access to files storing sensitive personal data for 143 million Americans, including names, Social Security numbers, birth dates, addresses, driver's license numbers, credit card numbers, and other PII.

40.     According to Equifax, the hackers had access to the aforementioned sensitive, personal information of 143 million Americans from at least May 2017 until July 29, 2017, when the intrusion was discovered.

41.     Equifax's preliminary investigation found the breach was due to its error – a vulnerability in an application in its U.S. website – which allowed hackers access to certain files.

42.     While Equifax learned of the Data Breach on or before July 29, 2017, it waited for more than a month before informing the public. As of filing

---

[16]     http://www.stopthehacker.com/2010/03/03/the-underground-credit-card-blackmarket/

Case No.

00126062
CLASS ACTION COMPLAINT

1  this complaint, Plaintiff and Class members affected by the Data Breach still
2  have not been personally notified by Equifax.

3       43.    The Gramm-Leach-Bliley Act ("GLBA") imposes upon "financial
4  institutions", including credit reporting agencies such as Equifax, "an affirmative
5  and continuing obligation to respect the privacy of its customers and to protect
6  the security and confidentiality of those customers' nonpublic personal
7  information." 15 U.S.C. §6801. To satisfy this obligation, financial institutions
8  must satisfy certain standards relating to administrative, technical, and physical
9  safeguards:

10      (1) to insure the security and confidentiality of customer records and
11      information;
12      (2) to protect against any anticipated threats or hazards to the security or
13      integrity of such records; and
14      (3) to protect against unauthorized access to or use of such records or
15      information which could result in substantial harm or inconvenience to any
16      customer.

17  15 U.S.C. §6801(b) (emphasis added).

18      44.    In order to satisfy their obligations under the GLBA, financial
19  institutions must "develop, implement, and maintain a comprehensive
20  information security program that is [1] written in one or more readily accessible
21  parts and [2] contains administrative, technical, and physical safeguards that are
22  appropriate to [their] size and complexity, the nature and scope of [their]
23  activities, and the sensitivity of any customer information at issue." *See* 16
24  C.F.R. §314.3.

25      45.    Under the Interagency Guidelines Establishing Information Security
26  Standards, 12 CFR Appendix D-2 to Part 208, financial institutions have an
27  affirmative duty to "develop and implement a risk-based response program to
28  address incidents of unauthorized access to customer information in customer

BLOOD HURST & O'REARDON, LLP

information systems." *See id.* at Supplement A, §II.

46.    Further, "[w]hen a financial institution becomes aware of an incident of unauthorized access to sensitive customer information, the institution should conduct a reasonable investigation to promptly determine the likelihood that the information has been or will be misused. If the institution determines that misuse of its information about a customer has occurred or is reasonably possible, it should notify the affected customer as soon as possible." *See id*. at Supplement A, §III.A.

47.    "Nonpublic personal information," includes PII (such as the PII compromised during the Data Breach) for purposes of the GLBA. Likewise, "sensitive customer information" includes PII for purposes of the Interagency Guidelines Establishing Information Security Standards.

48.    Equifax failed to "develop, implement, and maintain a comprehensive information security program" with "administrative, technical, and physical safeguards" that were "appropriate to [its] size and complexity, the nature and scope of [its] activities, and the sensitivity of any customer information at issue." This includes, but is not limited to: (a) Equifax's failure to implement and maintain adequate data security practices to safeguard Plaintiff's and Class members' PII; (b) failing to detect the Data Breach in a timely manner; and (c) failing to disclose that Defendant's data security practices were inadequate to safeguard Plaintiff's and Class members' PII.

49.    Equifax also failed to "develop and implement a risk-based response program to address incidents of unauthorized access to customer information in customer information systems[.]" This includes, but is not limited to, Equifax's failure to notify the affected individuals themselves of the Data Breach in a timely and adequate manner.

00126062

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

*Equifax's Belated Description of the Data Breach Is Inadequate and Misleading*

50.     As of September 8, 2017, more than one month since Equifax discovered the Data Breach, it still had not sent Plaintiff and Class members notice that their sensitive PII was compromised and stolen. Instead, as described herein, the belated public statements Equifax did make about the Data Breach are misleading, incomplete and fail to provide consumers with basic, important information about the scope and breadth of the stolen PII, and even whether their sensitive PII was accessed and stolen in the first place.

51.     On September 7, 2017, Equifax issued a press release that hackers gained access to the most sensitive, private data of 143 million Americans. The release is materially misleading and does not disclose to consumers the full scope of the ongoing threat. For example, while the first line of Equifax's press release states "No Evidence of Unauthorized Access to Core Consumer or Commercial Credit Reporting Databases", the release goes on to state that names, Social Security numbers, birth dates, addresses, driver's license numbers, credit card numbers, and "certain dispute documents with personal identifying information" were accessed.

52.     On September 7, 2017, Equifax set up a website where it instructed consumers to "determine if their information has been potentially impacted and to sign up for credit file monitoring and identity theft protection." The website, www.equifaxsecurity2017.com, is also misleading and does not provide material information to consumers. For example, on September 7, 2017, the website did not inform anyone that their PII had been impacted or potentially impacted. Instead, it merely instructed some consumers that they should check back at a future date to enroll in a "credit file monitoring and identity theft protection" product called TrustedID Premier. On September 8, 2017, it appears Equifax updated the information on its website to vaguely state for some consumers, such

1  as Plaintiff, that "Based on the information provided, we believe that your

2  personal information *may* have been impacted by this incident."

3      53.    Equifax's Data Breach press release and website also failed to

4  explain the breadth of the Data Breach and the potential threat that consumers'

5  face as a result of the sensitive PII being in the hands of criminals. For example,

6  there are no specifics about how the breach occurred or why their consumer PII

7  was not properly safeguarded and protected.

8      54.    Many affected consumers will not see Equifax's press release or

9  check if they were potentially impacted by visiting Equifax's website. Equifax

10  could have sent text messages, like J.P. Morgan Chase and other banks use to

11  instantly notify customer of a fraud alert of breach of their secured account, but

12  instead chose to only issue a press release and set up a website.

13      55.    Thus, Equifax's press release, its website for consumers to check for

14  potential impact, and its other public statements about the Data Breach are

15  misleading and do not adequately inform consumers whether their information

16  was accessed and stolen, or what types of their information was accessed and

17  stolen.

18  ***Equifax's Offer of Limited Credit Monitoring Is Inadequate and May***

19  ***Compromise Consumers' Rights***

20      56.    Equifax's Data Breach notices also squarely place the burden on

21  Plaintiff and Class members, rather than Equifax, to protect themselves and

22  mitigate their data breach damages. Equifax instructed its customers to review

23  their account statements, monitor their credit reports, and obtain fraud alerts:

24  "please monitor your account statements and report any unauthorized charges to

25  your credit card companies and financial institutions" and "remain vigilant for

26  incidents of fraud and identity theft by reviewing account statements and

27  monitoring your credit reports."

28

BLOOD HURST & O'REARDON, LLP

16

Case No.

**CLASS ACTION COMPLAINT**

57.     Equifax's Data Breach notice states that Equifax will provide one year of credit monitoring and identity theft protection to U.S. consumers. The offered "credit monitoring," however, is inadequate and requires affected customers to spend additional time and resources to obtain full coverage. Moreover, Equifax is not actually providing the credit monitoring product at this time. Instead, even consumers whom Equifax believes may have been impacted are only provided a future date when they must return to Equifax's website to complete the process for signing up for TrustedID Premier. To make matters worse, unbeknownst to the reasonable consumer, to sign up for TrustedID Premier, Equifax purports to bind them to its "Terms of Use", which includes a mandatory arbitration provision and class action waiver.

58.     The one-year credit monitoring offered by Equifax also does not provide comprehensive protection to the affected customers. Equifax does not disclose this important fact. For example, the limited one-year offer does not include monitoring the online black market for identity theft.

59.     Equifax's Data Breach notices also states you may wish to place a "fraud alert" on your credit report. Equifax's Data Breach notices do not disclose the important fact that a fraud alert may not prevent the misuse of existing accounts, and for that reason the Federal Trade Commission still recommends "You still need to monitor all bank, credit card and insurance statements for fraudulent transactions."[17]

60.     Equifax's Data Breach notice also states you may wish to place a "credit freeze" on your credit reports. As a general rule, the fee to place a "credit freeze" on one's credit report, as suggested by the Data Breach notice, is approximately $5-$10 each time it is placed at each of the three credit reporting agencies (Equifax, Experian and TransUnion). Thereafter, in order to allow anyone to check your credit, there is also an associated fee each time to lift the

---

[17]     http://www.consumer.ftc.gov/articles/0497-credit-freeze-faqs

00126062

BLOOD HURST & O'REARDON, LLP

freeze. Moreover, if an identify thief has already used data to open accounts, then a credit freeze will not provide any benefits. A credit freeze also does not prevent identity thieves from making changes to existing accounts.

61.    Monitoring one's credit reports, another option suggested by the Data Breach notice, would cause an affected consumer to incur an expense to see his or her credit reports beyond the one free annual report to which they are entitled.

***Equifax Failed to Honor Its Promises to Keep Sensitive Personal Information Confidential***

62.    Equifax touts itself as an industry leader in data breach security and often promotes the importance of data breach prevention. Equifax offers services directly targeted to assisting consumers who have encountered a data breach. This includes credit-monitoring and identity-theft protection products to guard consumers' personal information.

63.    Equifax describes itself as a "global information solutions company that uses ***trusted*** unique data, innovative analytics, technology and industry expertise to power organizations and individuals around the world by transforming knowledge into insights that help make more informed business and personal decisions."[18]

64.    Equifax says that it "develop[s], maintain[s] and enhance[s] secured proprietary information databases through the compilation of consumer specific data, including credit, income, employment, asset, liquidity, net worth and spending activity, and business data, including credit and business demographics, that we obtain from a variety of sources, such as credit granting institutions, income and tax information primarily from large to mid-sized companies in the U.S., and survey-based marketing information. We process this information

---

[18]    *See* http://www.equifax.com/about-equifax/company-profile/ (last visited September 8, 2017).

Case No.
CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

utilizing our proprietary information management systems. We also provide information, technology and services to support debt collections and recovery management."[19]

65.   Equifax concedes that "[b]usinesses rely on us for consumer and business credit intelligence, credit portfolio management, fraud detection, decisioning technology, marketing tools, debt management and human resources-related services. We also offer a portfolio of products that enable individual consumers to manage their financial affairs and protect their identity."[20]

66.   Although Equifax knows about the vulnerabilities of its online website applications and databases and lack of internal supervisory mechanisms, Equifax continued to represent and promise that consumers' personal and private information was safe and secure.

67.   Equifax is well aware of the dangers of identity theft cautioning consumers that "[i]dentity theft is committed when someone steals your personal information – such as your name, Social Security number, and date of birth – typically to hijack your credit and use it to open up new credit accounts, take out loans in your name, or access your bank or retirement accounts. An identity thief can even use your personal information to steal your tax refunds, seek medical services, or commit crimes in your name."[21]

68.   Equifax acknowledges that "[o]nce an identity thief has access to your personal information, he or she can also:

---

[19]   *See*                 https://otp.tools.investis.com/clients/us/equifax/SEC/sec-show.aspx?Type=html&FilingId=12019947&Cik=0000033185   (last   visited September 8, 2017).

[20]   *See*   file:///E:/BHO/Equifax/2016_annual_report.pdf   (last   visited September 8, 2017).

[21]   *See*   https://www.equifax.com/personal/education/identity-theft/what-is-identity-theft (last visited September 8, 2017).

Case No.
**CLASS ACTION COMPLAINT**

00126062

BLOOD HURST & O'REARDON, LLP

● Open new credit card accounts with your name, Social Security number and date of birth. When the thief charges to the credit cards and leaves the bills unpaid, the delinquency will be reported to your credit report and could impact your credit score;

● Open a bank account in your name and write bad checks on the account;

● Create counterfeit checks or debit cards and use them to drain your existing bank accounts;

● File for bankruptcy under your name to avoid paying debts;

● Set up a phone, wireless, or other utility service in your name."

69.    In articles and white papers regularly published by Equifax it recognizes the increasing risk of identity theft and the "Emotional Toll of Identity Theft" on victims.[22]

70.    At all relevant times, Equifax designed and implemented its policies and procedures regarding the security of protected financial information and sensitive information. These policies and procedures failed to adhere to reasonable and best industry practices in safeguarding protected financial information and other sensitive information.

71.    Plaintiff and Class members relied on Equifax to keep their sensitive information safeguarded and otherwise confidential.

72.    Equifax's wrongful actions, inaction, omissions, and want of ordinary care in failing to completely and accurately notify Plaintiff and the

---

[22] *See* http://www.equifax.com/pdfs/corp/EFS-714-ADV_Predictive_Model_Fraud_WP_72409.pdf; https://www.equifax.com/assets/PSOL/15-9814_psol_emotionalToll_wp.pdf; http://www.equifax.com/about-equifax/press-release-detail/en_gb?newsId=e7b7bb5b-dacb-4347-8f73ac19d312; https://www.equifax.co.uk/data-breach/pdf/Identity%20Theft%20and%20Data%20Breach%20Whitepaper%2010-16_2.pdf (all last visited September 8, 2017).

BLOOD HURST & O'REARDON, LLP

Class about the Data Breach and corresponding unauthorized release and disclosure of their personal information was arbitrary, capricious and in derogation of Equifax's duties to Plaintiff and the Class.

## CLASS ALLEGATIONS

73.   Plaintiff brings this class action lawsuit on behalf of himself and all other members of the Class (the "National Class") defined as follows:

> All persons in the United States whose personal or financial information was compromised as a result of the data breach first disclosed by Equifax on or about September 7, 2017.

74.   In the alternative to the National Class, Plaintiff seeks certification of a "Multistate Class" composed of statewide classes of persons from states with similar laws as applied to the facts of this case, or in the alternative, a California Class defined as follows:

> All persons in California whose personal or financial information was compromised as a result of the data breach first disclosed by Equifax on or about September 7, 2017.

75.   The National Class, Multistate Class, and California Class are collectively referred to as the Class.

76.   Excluded from the Class are: (1) Equifax and its officers, directors, employees, principals, affiliated entities, controlling entities, agents, and other affiliates; (2) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of their immediate families.

77.   **Numerosity.** While the exact number of Class members is unknown, Equifax has admitted the personal information, including names, Social Security numbers, birth dates, addresses, and in some instances, driver's license numbers of approximately 143 million Americans was taken during the Data Breach. Plaintiff therefore believes that the Class is so numerous that

Case No.

00126062

1  joinder of all members is impractical.

2      78.  **Typicality.** Plaintiff's claims are typical of the claims of the Class.

3  Plaintiff and the Class members were injured by the same wrongful acts,

4  practices, and omissions committed by Equifax, as described herein. Plaintiff's

5  claims therefore arise from the same practices or course of conduct that give rise

6  to the claims of all Class members.

7      79.  **Commonality.** Common questions of law and fact exist as to all

8  Class members and predominate over any individual questions. Such common

9  questions include, but are not limited to:

10          (a)  Whether Equifax has engaged in unlawful, unfair or

11  fraudulent business acts or practices;

12          (b)  Whether Equifax has engaged in the wrongful conduct

13  alleged herein;

14          (c)  Whether Equifax used reasonable or industry standard

15  measures to protect Class members' personal and financial information;

16          (d)  Whether Equifax adequately or properly segregated its

17  network so as to protect personal customer data;

18          (e)  Whether Equifax knew or should have known prior to the

19  security breach that its network was susceptible to a potential data breach;

20          (f)  Whether Equifax should have notified the Class that it failed

21  to use reasonable and best practices, safeguards, and data security measures to

22  protect customers' personal and financial information;

23          (g)  Whether Equifax should have notified Class members that

24  their personal and financial information would be at risk of unauthorized

25  disclosure;

26          (h)  Whether Equifax intentionally failed to disclose material

27  information regarding its security measures, the risk of data interception, and the

28  Data Breach;

Case No.
**CLASS ACTION COMPLAINT**

BLOOD HURST & O'REARDON, LLP

00126062

1           (i)      Whether Equifax's acts, omissions, and nondisclosures were

2   intended to deceive Class members;

3           (j)      Whether Equifax's conduct violated the laws alleged;

4           (k)      Whether Plaintiff and the Class members are entitled to

5   restitution, disgorgement, and other equitable relief; and

6           (l)      Whether Plaintiff and the Class members are entitled to

7   recover actual damages, statutory damages, and punitive damages.

8       80.   **Adequacy.** Plaintiff will fairly and adequately protect the interests

9   of the Class members. Plaintiff is an adequate representative of the Class in that

10  he has no interests which are adverse to or conflict with those of the Class

11  members Plaintiff seeks to represent. Plaintiff has retained counsel with

12  substantial experience and success in the prosecution of complex consumer

13  protection class actions of this nature.

14      81.   **Superiority.** A class action is superior to any other available

15  method for the fair and efficient adjudication of this controversy since individual

16  joinder of all Class members is impractical. Furthermore, the expenses and

17  burden of individual litigation would make it difficult or impossible for the

18  individual members of the Class to redress the wrongs done to them, especially

19  given that the damages or injuries suffered by each individual member of the

20  Class may be relatively small. Even if the Class members could afford

21  individualized litigation, the cost to the court system would be substantial and

22  individual actions would also present the potential for inconsistent or

23  contradictory judgments. By contrast, a class action presents fewer management

24  difficulties and provides the benefits of single adjudication and comprehensive

25  supervision by a single court.

26

27

28

BLOOD HURST & O'REARDON, LLP

23

Case No.

**CLASS ACTION COMPLAINT**

# FIRST CAUSE OF ACTION

## Negligence

82.   Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

83.   During the course of conducting its business, Equifax collected consumer's PII. It was reasonably foreseeable that third parties would attempt to acquire such information given the risk and frequency of security breaches at Equifax and highly publicized breaches elsewhere, including a May 2016 incident in which Equifax's W-2 Express website suffered an attack that resulted in the leak of PII from 430,000 persons, a breach between April 17, 2016 and March 29, 2017 to customers' employee tax records, a breach announced by Equifax in January 2017 in which credit information of customers at partner LifeLock had been exposed, a breach announced by Equifax to the New Hampshire attorney general in May 2014, prior security alerts, and the potential fraudulent and criminal uses of the information if acquired, among other things.

84.   In addition, Equifax had notice of a possible security breach due to the prior targeting of other large retailers and financial institutions, including itself, by third parties seeking such information.

85.   Consequently, Equifax as a consumer credit reporting agency, entrusted with the sensitive PII of over 800 million consumers and 88 million businesses worldwide, was trusted by its customers and other consumers to safeguard their personal and private information, including sensitive financial data such as credit card numbers. Equifax had a special duty to exercise reasonable care to protect and secure the PII so as to prevent its collection, theft, or misuse by third parties.

86.   Equifax should have known to take precaution to secure consumers' PII, given its special duty.

BLOOD HURST & O'REARDON, LLP

00126062

24

Case No.

CLASS ACTION COMPLAINT

87.    Equifax likewise had a duty to exercise reasonable care under the circumstances to prevent any breach of security that would result in the loss, disclosure or compromise of the personal and financial information of Plaintiff and the Class, given its prior knowledge of security breaches.

88.    Equifax also had a duty to exercise reasonable care under the circumstances to detect any breach of security that would result in the loss, disclosure or compromise of the personal and financial information of Plaintiff and the Class.

89.    Once a security breach was detected, Equifax had a duty to exercise reasonable care under the circumstances to notify affected persons in order to minimize potential damage to Plaintiff and the Class due to the loss, disclosure or compromise of their personal and financial information.

90.    Equifax breached its duty of care by failing to adequately secure and protect Plaintiff's and the Class members' personal and financial information from theft, collection and misuse by third parties.

91.    Equifax further breached its duty of care by failing to promptly, clearly, accurately, and completely inform Plaintiff and the Class of the security breach.

92.    Plaintiff's and Class members' PII was transferred, sold, opened, viewed, mined and otherwise released, disclosed, and disseminated without their authorization as the direct and proximate result of Equifax's failure to design, adopt, implement, control, direct, oversee, manage, monitor and audit its processes, controls, policies, procedures and protocols for complying with the applicable laws and safeguarding and protecting Plaintiff's and Class members' PII.

93.    The policy of preventing future harm further weighs in favor of finding a special relationship between Equifax and the Class. Consumers count on Equifax to keep their personal information safe. If companies are not held

Case No.

BLOOD HURST & O'REARDON, LLP

00126062

BLOOD HURST & O'REARDON, LLP

accountable for failing to take reasonable security measures to protect consumers' private and personal information, such as names, social security numbers, and contact information, they will not take the steps that are necessary to protect against future data breaches.

94. It was foreseeable that if Equifax did not take reasonable security measures, the data of Plaintiff and members of the Class would be taken.

95. Major credit reporting agencies like Equifax face a higher threat of security breaches than other types and sizes of businesses due in part to the scope and breadth of the personal, private, and sensitive information that Equifax possesses about hundreds of millions of consumers.

96. As a direct and proximate result of Equifax's conduct and breach of its duties, Plaintiff and the Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity theft and identity fraud, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII, (iv) deprivation of the value of their PII, for which there is a well-established national and international market, (v) failure to receive the full benefit of their bargain as a result of receiving credit fraud and monitoring services that were less valuable than what they paid for, and/or (vi) the financial and/or temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

97. Neither Plaintiff nor other members of the Class contributed to the security breach, nor did they contribute to Equifax's employment of insufficient security measures to safeguard consumers' PII, including Social Security numbers and debit and credit card information.

98. Plaintiff and the Class seek compensatory damages and punitive damages with interest, the costs of suit and attorneys' fees, and other and further relief as this Court deems just and proper.

99.   Equifax's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach constitute common law negligence, gross negligence, and negligence *per se*.

## SECOND CAUSE OF ACTION

### Violations of the California Customer Records Act
### (Civil Code §1798.80, *et seq.*)

100.   Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

101.   "[T]o ensure that personal information about California residents is protected," the California Legislature enacted the Customer Records Act (the "California CRA"), Civil Code §1798.81.5, which requires that any business that "owns licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

102.   The events alleged herein constituted a "breach of the security system" of Equifax within the meaning of Civil Code §1798.82.

103.   The information lost, disclosed, or intercepted during the events alleged herein constituted unencrypted "personal information" within the meaning of Civil Code §§1798.80(e) and 1798.82(h).

104.   Equifax failed to implement and maintain reasonable or appropriate security procedures and practices to protect consumers' personal and financial information. On information and belief, Equifax failed to employ industry standard security measures, best practices or safeguards with respect to consumers' personal and financial information.

105.   Equifax failed to disclose the breach of security of its system in the most expedient time possible and without unreasonable delay after it knew or

Case No.

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

00126062

1  reasonably   believed   that   consumers'   personal   information   had   been
2  compromised.

3      106.   The breach of the personal information of millions of Equifax's
4  consumers' records constituted a "breach of the security system" of Equifax
5  pursuant to Civil Code §1798.82(g).

6      107.   By failing to implement reasonable measures to protect consumers'
7  personal data it maintained, Equifax violated Civil Code §1798.81.5.

8      108.   In addition, by failing to promptly notify all affected consumers that
9  their personal information had been acquired (or was reasonably believed to have
10 been acquired) by unauthorized persons in the data breach, Equifax violated Civil
11 Code §1798.82 of the same title in a manner that would reach all affected
12 consumers.

13     109.   By violating Civil Code §§1798.81.5 and 1798.82, Equifax "may be
14 enjoined" under Civil Code §1798.84(e).

15     110.   Accordingly, Plaintiff requests that the Court enter an injunction
16 requiring Equifax to implement and maintain reasonable security procedures to
17 protect consumers' data in compliance with the California Customer Records
18 Act, including, but not limited to: (1) ordering that Equifax, consistent with
19 industry standard practices, engage third party security auditors/penetration
20 testers as well as internal security personnel to conduct testing, including
21 simulated attacks, penetration tests, and audits on Equifax's systems on a
22 periodic basis; (2) ordering that Equifax engage third party security auditors and
23 internal personnel, consistent with industry standard practices, to run automated
24 security monitoring; (3) ordering that Equifax audit, test, and train its security
25 personnel regarding any new or modified procedures; (4) ordering that Equifax,
26 consistent with industry standard practices, conduct regular database scanning
27 and security checks; (5) ordering that Equifax, consistent with industry standard
28 practices, periodically conduct internal training and education to inform internal

BLOOD HURST & O'REARDON, LLP

Case No.

CLASS ACTION COMPLAINT

00126062

1  security personnel how to identify and contain a breach when it occurs and what

2  to do in response to a breach; and (6) ordering Equifax to meaningfully educate

3  its customers about the threats they face as a result of the loss of their financial

4  and personal information to third parties, as well as the steps Equifax customers

5  must take to protect themselves.

6      111.  Plaintiff further requests that the Court require Equifax to:

7  (1) identify and notify all members of the Class who have not yet been informed

8  of the data breach; and (2) to notify affected customers of any future data

9  breaches by email and text within 24 hours of Equifax's discovery of a breach or

10  possible breach, and by mail within 72 hours.

11      112.  As a result of Equifax's violation of Civil Code §§1798.81,

12  1798.81.5, and 1798.82, Plaintiff and Class members have suffered (and will

13  continue to suffer) economic damages and other injury and actual harm in the

14  form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk

15  of identity theft and identity fraud, (ii) invasion of privacy, (iii) breach of the

16  confidentiality of their PII, (iv) deprivation of the value of their PII, for which

17  there is a well-established national and international market, (v) failure to receive

18  the full benefit of their bargain as a result of receiving credit fraud and

19  monitoring services that were less valuable than what they paid for; and/or

20  (vi) the financial and/or temporal cost of monitoring their credit, monitoring their

21  financial accounts, and mitigating their damages.

22      113.  Plaintiff, individually and on behalf of the members of the Class,

23  seeks all remedies available under Civil Code §1798.84, including, but not

24  limited to: (a) damages suffered by members of the Class; and (b) equitable

25  relief. Plaintiff, individually and on behalf of the members of the Class, also

26  seeks reasonable attorneys' fees and costs under applicable law.

27

28

BLOOD HURST & O'REARDON, LLP

29

Case No.

CLASS ACTION COMPLAINT

**THIRD CAUSE OF ACTION**

**Violations of the California Unfair Competition Law
(Bus. & Prof. Code §17200, *et seq.*)**

114.   Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

115.   The California Unfair Competition Law, Bus. & Prof. Code §17200, *et seq.* ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of its above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Equifax engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

116.   In the course of conducting its business, Equifax committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class members' PII, and violating the statutory and common law alleged herein in the process, including, *inter alia,* California's Customer Records Act (Civ. Code §1798.80, *et seq.*), California's UCL, California's CLRA, the Gramm-Leach-Bliley Act, and common law negligence. Plaintiff and Class members reserve the right to allege other violations of law by Equifax constituting other unlawful business acts or practices. Equifax's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

117.   Equifax also violated the UCL by failing to timely notify Plaintiff and Class members regarding the unauthorized release and disclosure of their PII.

BLOOD HURST & O'REARDON, LLP

Case No.

00126062

118.   Equifax's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Equifax's wrongful conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous. California has a well-defined public policy embodied by various states statutes, including California's Customer Records Act and Information Practices Act to ensure that businesses that maintain customer's personal information implement and maintain reasonable security procedures and practices to protect the personal information from unauthorized access, destruction, use, modification or disclosure. The gravity of Equifax's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Equifax's legitimate business interests other than engaging in the above-described wrongful conduct.

119.   The UCL also prohibits any "fraudulent business act or practice." Equifax's above-described claims, nondisclosures and misleading statements were false, misleading and likely to deceive the consuming public in violation of the UCL.

120.   As a direct and proximate result of Equifax's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violations of the UCL, Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity theft and identity fraud, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII, (iv) deprivation of the value of their PII, for which there is a well-established national and international market, (v) failure to receive the full benefit of their bargain as a result of receiving credit fraud and monitoring services that were

BLOOD HURST & O'REARDON, LLP

Case No.

00126062

less valuable than what they paid for, and/or (vi) the financial and/or temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

121.   Unless restrained and enjoined, Equifax will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of himself, Class members, and the general public, also seeks restitution and an injunction prohibiting Equifax from continuing such wrongful conduct, and requiring Equifax to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code §17203.

## FOURTH CAUSE OF ACTION

### Violations of the Consumers Legal Remedies Act
### (Civil Code § 1750, *et seq.*)

122.   Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

123.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §1750, *et seq.* (the "Act") and similar laws in other states. Plaintiff is a consumer as defined by California Civil Code §1761(d). Equifax's TrustedID Premier Credit Monitoring & Identity Theft Protection is a "good" within the meaning of the Act.

124.   Equifax violated and continues to violate the Act by engaging in the following practices proscribed by California Civil Code §1770(a)(19) ("Inserting an unconscionable provision in the contract") in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of its TrustedID Premier products.

BLOOD HURST & O'REARDON, LLP

Case No.

00126062

125.   Equifax violated the Act by inserting an unconscionable provision in the contract for the TrustedID Premier monitoring product it offers Plaintiff, Class members and other consumers through the Data Breach. Buried within the fine-print adhesionary "Terms of Use" that accompany the TrustedID Premier product (and all products offered by Equifax) are purportedly mandatory binding arbitration and class action waiver provisions. Members of the Class do not reasonably know that they are potentially giving up valuable legal rights by accepting Equifax's post-breach offer of the limited credit monitoring product. On the other hand, Equifax, the drafter of the adhesionary provision and the party with superior bargaining power, receives unfairly one-sided benefits.

126.   Pursuant to California Civil Code §1782(d), Plaintiff, individually and on behalf of the other members of the Class, seeks a Court order enjoining the above-described wrongful acts and practices of Equifax and for restitution and disgorgement.

127.   Pursuant to §1782 of the Act, Plaintiff notified Equifax in writing by certified mail of the particular violations of §1770 of the Act, and demanded that Equifax rectify the problems associated with the actions detailed above and give notice to all affected consumers of Equifax's intent to so act. A copy of the letter is attached hereto as Exhibit A.

128.   If Equifax fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the Act, Plaintiff will amend this complaint to add claims for actual, punitive and statutory damages, as appropriate.

129.   Equifax's conduct is fraudulent, wanton, and malicious.

130.   Pursuant to §1780(d) of the Act, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

BLOOD HURST & O'REARDON, LLP

**FIFTH CAUSE OF ACTION**

**Declaratory Relief**

131.   Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

132.   An actual controversy has arisen in the wake of the Data Breach regarding Equifax's duties to safeguard and protect Plaintiff's and Class members' confidential and sensitive PII. Equifax's PII security measures were (and continue to be) woefully inadequate. Equifax disputes these contentions and contends that its security measures are appropriate.

133.   Plaintiff and Class members continue to suffer damages, other injury or harm as additional identity and financial theft and fraud occurs.

134.   Therefore, Plaintiff and Class members request a judicial determination of their rights and duties, and ask the Court to enter a judgment declaring, *inter alia*, (i) Equifax owed (and continues to owe) a legal duty to safeguard and protect Plaintiff's and Class members' confidential and sensitive PII, and timely notify them about the Data Breach, (ii) Equifax breached (and continues to breach) such legal duties by failing to safeguard and protect Plaintiff's and Class members' confidential and sensitive PII, and (iii) Equifax's breach of its legal duties directly and proximately caused the Data Breach, and the resulting damages, injury, or harm suffered by Plaintiff and Class members. A declaration from the Court ordering Equifax to stop its illegal practices is required. Plaintiff and Class members will otherwise continue to suffer harm as alleged above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all persons and consumers similarly situated, prays for judgment as follows:

A.      An Order certifying the proposed Class defined herein, designating Plaintiff as representative of said Class, and appointing the

BLOOD HURST & O'REARDON, LLP

1    undersigned counsel as Class Counsel;

2    B.    For restitution of all amounts obtained by Equifax as a result of its

3          wrongful conduct in an amount according to proof at trial, plus pre-

4          judgment and post-judgment interest thereon;

5    C.    For all recoverable compensatory, consequential, actual, and/or

6          statutory damages in the maximum amount permitted by law;

7    D.    For punitive and exemplary damages;

8    E.    For other equitable relief;

9    F.    For such injunctive relief, declaratory relief, orders, or judgment as

10         necessary or appropriate to prevent these acts and practices;

11   G.    For payment of attorneys' fees and costs of suit as allowable by law;

12         and

13   H.    For all such other and further relief as the Court deems just and

14         proper.

15                          **<u>DEMAND FOR JURY TRIAL</u>**

16         Plaintiff hereby demands a jury trial on all issues so triable.

17                                   Respectfully submitted,

18   Dated: September 8, 2017        BLOOD HURST & O'REARDON, LLP
                                     TIMOTHY G. BLOOD (149343)
19                                   THOMAS J. O'REARDON II (247952)
                                     JENNIFER L. MACPHERSON (202021)
20

21                                   By:      *s/ Timothy G. Blood*
                                           TIMOTHY G. BLOOD
22
                                     701 B Street, Suite 1700
23                                   San Diego, CA  92101
                                     Tel: 619/338-1100
24                                   619/338-1101 (fax)
                                     tblood@bholaw.com
25                                   toreardon@bholaw.com
                                     jmacpherson@bholaw.com
26
                                     BARNOW AND ASSOCIATES, P.C.
27                                   BEN BARNOW
                                     ERICH P. SCHORK
28                                   1 North LaSalle Street, Suite 4600

                                     35
Case No.

00126062

1    Chicago, IL  60602
     Tel: 312/621-2000
2    312/641-5504 (fax)
     b.barnow@barnowlaw.com
3    e.schork@barnowlaw.com

4    THE COFFMAN LAW FIRM
     RICHARD L. COFFMAN
5    First City Building
     505 Orleans St., Fifth Floor
6    Beaumont, TX  77701
     Tel: 409/833-7700
7    866/835-8250 (fax)
     rcoffman@coffmanlawfirm.com

8    *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O'REARDON, LLP

                                          Case No.

CLASS ACTION COMPLAINT

00126062